Case 4:23-cv-02570   Document 59   Filed on 01/24/25 in TXSD   Page 1 of 18

United States District Court
Southern District of Texas
**ENTERED**
January 24, 2025
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **DELMAR SYSTEMS, INC,** | § § § § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION NO. 4:23-cv-02570 |
| **BARDEX CORPORATION,** | § § § | |
| *Defendant.* | § § § § | |

## ORDER

Pending before the Court are several motions: Plaintiff Delmar Systems ("Plaintiff" or "Delmar") filed a Motion for Summary Judgment, (Doc. No. 34), Defendant Bardex Corp. ("Defendant" or "Bardex") filed a Motion for Summary Judgment, (Doc. No. 35), Plaintiff filed a Motion to Strike Defendant's Motion for Summary Judgment as Untimely, (Doc. No 36), and Defendant filed a Motion to Strike Plaintiff's Supplemental Disclosures attached as summary judgment evidence as untimely. (Doc. No. 46). Based on the evidence and controlling law, the Court finds that it lacks subject matter jurisdiction over Plaintiff Delmar's federal patent cause of action. The Court therefore **GRANTS** Defendant's Motion for Summary Judgment to the extent it addresses jurisdiction, (Doc. No. 35), and **DISMISSES** the case without prejudice for lack of subject matter jurisdiction.

**I.    Background**

This is a patent case that presents one issue: whether Dillon Shuler, Delmar's former employee, should have been included as a co-inventor on the '160 Patent currently owned by

Bardex.[1] Delmar brings this suit pursuant to the cause of action authorized by 35 U.S.C. § 256. Section 256 provides that when "through error, an inventor is not named in an issued patent . . . . The Court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Direct shall issue a certificate accordingly." 35 U.S.C. § 256(a)–(b). Delmar argues that Shuler developed the methodology that served as the basis for the '160 Patent, and that Bardex improperly omitted Shuler from the patent application that used Shuler's work. (Doc. No. 34 at 2).

Delmar and Bardex are both involved in the design, engineering, and implementation of mooring and anchoring systems for vessels and offshore facilities. (*Id.*); (Doc. No. 35-1 at 1). At some point, employees of Bardex, Nick Atallah and Dennis Graney, discerned that there was a need to incorporate its underwater fairlead chain stopper product—a common piece of equipment in the industry—into an in-line mooring tensioning application. (Doc. No. 34-1 at 24–27). Delmar claims that Atallah and Graney told Shuler—a Delmar employee at the time—in an email that "if we come up with something good, maybe Delmar and Bardex could co-patent an improved product/method." (Doc. No. 34-1 at 33). Bardex alleges that Atallah and Graney discussed design ideas for this project themselves and memorialized their ideas on a cocktail napkin. (Doc. No. 35-14 at 1). After the original plans had been drawn, as Bardex contends, Atallah and Graney invited Shuler to meet them at a local wine bar where they discussed their ideas. (Doc. No. 35-4 at 74).

At this wine bar meeting, Delmar contends that Shuler advised them on the feasibility of their ideas and offered solutions. (Doc. No. 34-1 at 41). Delmar alleges that, at that meeting, Shuler came up with the idea of "attaching the mooring line to the facility and mounting the BarLatch on the service vessel and pulling the line to tension from the service vessel." (*Id.* at 47). Bardex denies

---

[1] There are six state-law claims brought by Delmar against Bardex that have been severed and abated pending the resolution of this claim. *See* (Doc. No. 33).

that claim and argues that Shuler's only contribution to the wine bar meeting was about his ability to provide simulations and layout drawings. (Doc. No. 35-1 at 3).

Delmar contends that, upon performing the simulation, Shuler determined that the napkin design would not work and endeavored to redesign the methodology. (Doc. No. 34 at 7). After informing Atallah of his findings, Delmar claims that Shuler then had a proposal drafted for Delmar to perform further research and design a methodology to improve the concept. (Doc. No. 34-1 at 69). Following Atallah and Graney's request that Shuler perform a "standard initial feasibility modeling of the idea memorialized in the napkin," however, Bardex contends that there was no further substantive contribution by Shuler or Delmar. (Doc. No. 35-1 at 5).

After Shuler allegedly provided Atallah and Graney with the results from the modeling they requested, they engaged a patent attorney and filed an application to the patent office reflecting only the Bardex employees as inventors. (Doc. No. 35-1 at 6). Delmar points the Court to a "Memorandum of Understanding," ("MOU"), that Bardex would submit a proposal to its customers for the method developed and that Delmar would "provid[e] the installation methodology / assessment report . . . ." (Doc. No. 34-4 at 35–38). Bardex contends that the MOU reflected solely an intent to get client approval for the use of Delmar in the performance of the methodology. (Doc. No. 35 at 10; 35-19 at 1).

Delmar filed a motion for summary judgment on the merits of its claim under § 256. (Doc. No. 34). Bardex's response in opposition argues that there is a genuine issue of fact regarding whether Shuler's contributions to the Mooring and Tensioning Methods, Systems, and Apparatus that resulted in the '160 Patent were substantive enough to rise to the level of "inventor" as defined in the Federal Circuit's case law. (Doc. No. 43 at 1). Specifically, because patents are presumed

valid, Delmar must meet its burden by clear and convincing evidence, which Bardex contends is has failed to do. (*Id.* at 2).

In addition to the parties' merits arguments, the pending motion also raises the antecedent question of Delmar's standing to bring this suit. Bardex's Motion for Summary Judgment argues that Delmar has no standing because it has no assignment rights to, or financial interest in, the '160 Patent. (Doc. No. 35 at 1). In its response, Delmar attached a copy of an Intellectual Property Agreement ("IPA") that Shuler signed at the outset of his employment in 2013. (Doc. No. 40-2). Delmar argues that the IPA automatically assigned it all rights in Shuler's future patents. (Doc. No. 40 at 3). Based on this agreement, Delmar concludes it has standing.

Since Delmar failed to disclose the IPA prior to the summary judgment motions, Bardex filed a Rule 37 Motion to Strike Plaintiff's exhibits as untimely and prejudicial. (Doc. No. 46). Under Rule 37, the Court can strike untimely exhibits unless the disclosing party can show that the untimely disclosure was justified or harmless. *Mission Toxicology, LLC v. UnitedHealthcare Ins. Co.*, 499 F. Supp. 3d 338, 344 (W.D. Tex. 2020). As Delmar failed to produce the IPA until 103 days after the end of discovery, Bardex contends that the supplemental disclosure is both unjustified and harmful under Rule 37(c)(1). In response, Delmar argues that its disclosures were justified because Plaintiff did not see the IPA as relevant to Defendant's discovery requests. On the point of relevancy, Bardex provided the Court with specific examples of requests for production to which the IPA was plainly responsive. Nevertheless, Delmar maintains its position that the IPA was irrelevant to any request for production or interrogatory. [2]

---

[2] Delmar's position is untenable. This document should have been produced as a part of its initial disclosures. Federal Rule 26 requires a copy of all documents that "may be used to support its claims . . . . FED. R. CIV. PRO 26. There is no universe in which a party or competent attorney would not consider this claimed assignment to be such a document—unless, of course, Delmar knows that the IPA does not, in fact, legally assign Delmar any rights in the patent.

4

Bardex's Motion for Summary Judgment, while asking for a judgment on the merits, primarily challenges this Court's subject matter jurisdiction. Thus, if the Court strikes all of Delmar's evidence, it would essentially be denying Delmar a chance to prove its own standing—which would be dispositive on the jurisdictional question. At this stage, the Court does not see the need to grant the Rule 37 Motion to Strike because the inclusion of Delmar's evidence in the Court's analysis does not change the Court's ruling. Nevertheless, if called upon to rule on the merits of Bardex's Motion to Strike, the Court would grant the motion to strike in addition to considering the entire array of sanctions available to it.[3]

## II.   Legal Standards

*a. Summary Judgment Standards*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact

---

Moreover, Bardex points to its First Request for Production #8, the RFP that asks Delmar to "Produce all documents related to any license or assignment of the mooring line tensioning invention between Dillon Shuler and Plaintiff." (Doc. No. 46-1 at 7). The Court finds the belated revelation about the existence and relevance of this document to be quite troublesome, but given the Court's ruling as expressed herein, it need not address the issue of what sanctions to assess against the Plaintiff.

[3]   Importantly, however, the present motions only concern Delmar's claim based on 35 U.S.C. § 265. The Court's ruling does not resolve the merits of the additional state law claims that are severed and abated pending resolution of the patent claim.

is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255.

The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

  b. *Article III Standing Requirements*

Federal courts are courts of limited jurisdiction and must have statutory or constitutional power to adjudicate a claim. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). A federal court has original jurisdiction to hear a suit when it is asked to adjudicate a case or controversy that arises under federal-question or diversity jurisdiction. U.S. Const., art. III, § 2, cl. 1; 28 U.S.C. §§ 1331–32. Whether a federal court has jurisdiction must "be established as a threshold matter" and "is inflexible and without exception." *Webb v. Davis*, 940 F.3d 892, 896 (5th Cir. 2019) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)). Plaintiff, as the party asserting jurisdiction, bears the burden of proof to establish that it has standing to bring a suit. *Id.*

Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, "a plaintiff must show: (i) that [he] suffered an injury in fact that is concrete, particularized, and actual or

imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560–61). "As the party invoking federal jurisdiction," Plaintiff "bear[s] the burden of demonstrating" standing to bring the claims alleged. *Id.* at 2207. Primarily at issue here is the first element—injury in fact. To establish an injury in fact, a plaintiff "must show that he or she suffered 'an invasion of a legally protected interest'" that goes beyond "conjectural or hypothetical." *Spokeo, Inc. v. Roberts*, 578 U.S. 330, 339 (2016) (citing *Lujan*, 504 U.S. at 560).

    c.  *35 U.S.C. § 256 Action to Correct the Inventorship of the '160 Patent*

Patents are presumed valid, and the presumption of validity extends to inventorship. *Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001) (citing *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)). "[T]o rebut this presumption, a party challenging patent validity for omission of an inventor must present clear and convincing evidence that the omitted individual actually invented the claimed invention." *Id.* (citing *Environ Prods. v. Furon Co.*, 215 F.3d 1261, 1265 (Fed. Cir. 2000)). "In the event that Plaintiff and/or Intervenor does so, 35 U.S.C. § 256 grants this Court the authority to order the PTO to add the omitted inventor to the patent-in-suit." *Pei-Herng Hor v. Ching-Wu*, No. 4:08-CV-3584, 2015 WL 269123, at *16 (S.D. Tex. Jan. 21, 2015); see also *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998).

**III.   Analysis**

Since Bardex's motion for summary judgment challenges, among other things, Delmar's standing, and thus subject matter jurisdiction, the Court must address that issue before any other consideration of the merits. *Louisiana v. Dept. of Homeland Security*, 726 F. Supp. 3d 653, 666 (E.D. La. 2024). As noted above, the Court recognizes that Delmar's responsive summary

judgment evidence was untimely and improperly disclosed; nevertheless, the Court will consider it solely for the purposes of determining its subject matter jurisdiction over the case.

*A. Bardex argues that Delmar has no standing to bring the § 256 suit.*

Bardex argues that Delmar has shown no legal right or financial interest in the recorded ownership of '160 Patent and, therefore, no concrete and particularized injury that can be redressed by a court's ruling. (Doc. No. 35 at 1). This interest is critical for standing, and standing is a constitutional prerequisite for subject matter jurisdiction. Whether a plaintiff has standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

In order for Delmar to have standing, it must have either an ownership interest or a concrete financial interest in the patent itself. *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1325–26 (Fed. Cir. 2009). An ownership interest can be shown through an employment agreement with a patent assignment clause. "A patent assignment clause may presently assign a to-be-issued patent automatically—in which case no further acts to effectuate the assignment are necessary—or may merely promise to assign the patent in the future." *Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148, 1152 (Fed. Cir. 2021). The general rule recognized in the Federal Circuit is that "rights in an invention belong to the inventor," and thus, "an inventor must expressly grant his rights in an invention to his employer if the employer is to obtain those rights." *Id.* (citing *Bd. of Trustees of Leland Stanford Jr. Univ. v. Roche Mol. Sys., Inc.*, 563 U.S. 776, 785–86 (2011)).

In the absence of an express ownership interest, Delmar can also satisfy standing requirements by establishing a "concrete financial interest" in the '160 Patent by alleging concrete and specific financial entitlements or losses based on the listed inventorship of the patent. *Larson*, 569 F.3d at 1326. The concrete and specific nature of these interests is critical—contingent or

8

hypothetical potential interests are insufficient to establish standing. *Id.* at 1326–27 (holding that because a party's financial interest in the patents was contingent on the outcome of additional antecedent claims, there was insufficient financial interest to establish standing for a § 256 claim).

Bardex first argues that Delmar has no such interests because Shuler never assigned Delmar his interest, if any, the '160 Patent, and Delmar cannot show a single concrete financial interest in the patent itself. Bardex pointed to the fact that Delmar had never produced a single assignment agreement regarding the '160 Patent between Shuler and Delmar, and the assignment agreement that it did produce concerned a different patent. (Doc. No. 35 at 17). Further, Shuler testified in his deposition that he did not generally assigned inventions to Delmar as a part of his employment. (Doc. No. 35-3 at 13). The one patent he did assign to Delmar involved a different patent, and he noted that the assignment was not made through the IPA, but through an additional assignment agreement. (*Id.* at 13–14). In other words, it was not automatically assigned by virtue of the IPA. As such, Bardex argues that Delmar has no assignment rights, and therefore no ownership interest, in the '160 Patent.

Second, Bardex points to Delmar's lack of concrete financial interest in the '160 Patent. (Doc. No. 35 at 13–15). Concrete financial interests can be shown if Delmar can establish that it has "been deprived" of interests that are concrete and directly attributable to the omission of the co-inventor's name. *Univ. of Chi. & Arch. Dev. Corp.*, 254 F.3d 1347, 1359 (Fed. Cir. 2001). Vague or contingent interests are insufficient to satisfy this requirement. *Larson*, 569 F.3d at 1326.

Pointing to deposition testimony, Bardex argues that Delmar has produced no summary judgment evidence in response to demonstrate a concrete and specific financial stake in Shuler's inventorship of the '160 Patent. In the deposition of Delmar's CEO, for example, when asked about

9

the alleged lost profits, he stated that "there is a significant number of . . . opportunities off in the future . . . there's plenty of lost revenue both in the past and future." (Doc. No. 35-2 at 18).

Based on the evidence that had been disclosed to Bardex at the time it filed its motion, the Court finds that Bardex showed that Delmar failed to establish an ownership interest or concrete financial interest in the '160 Patent. As such, the Court finds that Bardex carried its burden to show that Delmar lacks standing to bring its § 256 motion to correct the recorded inventorship of the '160 Patent. At this point, the Court notes the procedural idiosyncrasy here compared to how summary judgment motions ought to work. Namely, Delmar's response in opposition relies exclusively on evidence that was requested and required under Rule 26, but never produced to Bardex.[4] In fact, Delmar's counsel denied its very existence. Nevertheless, the Court considers Delmar's evidence to the extent that it raises a fact issue regarding its Article III standing.

### B. *Delmar's evidence fails to establish standing as a matter of law.*

In response, Delmar first points to the IPA signed by Shuler at the beginning of his employment with Delmar to show that Delmar owned all of Shuler's inventions and intellectual property. (Doc. No. 40 at 3). If the IPA did evince such an agreement, Delmar would have a direct ownership interest (or at least raise an issue of material fact regarding such an interest) in Shuler's proper inclusion as a co-inventor. Second, Delmar claims certain "shop rights" and "a concrete financial interest" in the '160 Patent, each of which it argues independently satisfies Article III standing. (*Id.*).

---

[4] Interestingly, when Bardex complained to the Court that Delmar had failed to comply with its discovery obligations, Delmar sent a letter to this Court stating that it had disclosed all relevant agreements, verified that "there was no other assignments in existence," and stated, "Delmar cannot produce what does not exist." (Doc. No. 35-18 at 1).
 It is of great interest to the Court that Delmar claimed at different times: (1) that no such agreement existed; and (2) that the IPA was irrelevant to the case, but now claims that it is the cornerstone of its response to Bardex's motion for summary judgment. In the Court's view, these statements go beyond questionable and enter into the realm of outright deception on the Court.

10

Starting with the Intellectual Property Agreement, Delmar relies on the language of the IPA to argue that the rights to Shuler's inventions were automatically assigned to Delmar. Despite the IPA being the evidence principally relied on, Delmar quotes only one provision of the IPA to support this assertion:

> EMPLOYEE will promptly and fully disclose to COMPANY all inventions, designs, improvements, discoveries, methods, formulas, devices and/or computer programs which EMPLOYEE may make, create or originate during the term of his or her employment with COMPANY which in any way pertain or relate to the business of COMPANY or to any experimental work carried on by COMPANY, whether conceived by EMPLOYEE alone or with others and whether or not conceived during regular working hours. All such inventions, designs, improvements, discoveries, methods, formulas, devices and/or computer programs, including all patents related thereto, **shall be the exclusive property of COMPANY**. **EMPLOYEE shall assist COMPANY**, at COMPANY's sole expense, to obtain patents for COMPANY on all such inventions, designs, improvements, methods, formulas, devices and/or computer programs deemed by COMPANY (In its sole discretion) to be patentable and/or of economic benefit to COMPANY.

(Doc. No. 40-2 at 2) (emphasis added). Based on this use of "shall," Delmar argues that the IPA created an automatic assignment of any ownership interest. (Doc. No. 40 at 3). Delmar's current interpretation finds some support in *Allergen*, an Eastern District of Texas case that read a similar provision containing "shall" to convey an automatic assignment of ownership. *See Allergen, Inc. v. Teva Pharmaceuticals USA, Inc.*, 2017 WL 11572810, at *8 (E.D. Tex. Aug. 3, 2017). In *Allergen*, the court concluded that the phrase "shall belong" constituted a present tense assignment of ownership of the invention to the company without any future assignment action taken by the inventor. *Id.* at *10. While "shall" is itself plainly a future-tense verb, the *Allergen* court determined that, in the context of that agreement, it denoted a present tense, mandatory obligation. *See Shall*, BLACK'S LAW DICTIONARY (12th ed. 2024). Specifically, the court noted that this reading of "shall" was supported by other language in the agreement—namely, a clause stating that the inventor "would have no claim for compensation for transferring the rights to her invention, because those rights had already been transferred to [company]." *Id.*

11

While the IPA states that it is governed by Louisiana law, the question of "whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases" and, therefore, "a matter of federal law." *DDB Tech., LLC v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008). Further, the question of whether the IPA constitutes a present assignment of rights or merely an agreement to assign rights in the future is a question of law, not fact. *Id.* As such, the Court's analysis of this issue focuses exclusively on the language of the IPA. For the following reasons, the Court finds that the IPA does not create a present assignment of rights and, therefore, Delmar does not have an ownership interest in the '160 Patent.

Initially, this Court notes the existence of any assignment to Delmar has been a matter raised throughout the litigation of this lawsuit. In response to Bardex's complaint about Delmar's recalcitrance in complying with legitimate discovery requests, Delmar made the following statement to the Court:

> In Bardex's letter of August 2, 2024, the first "unresolved discovery issue" is on its face not, "unresolved". Delmar produced the Assignment of Patent (DS214 – DS215) to Bardex. The Assignment produced by Delmar was addressed to Delmar's CEO in the corporate deposition. Bardex had the opportunity to cross-examine Delmar's CEO regarding the Assignment produced, and verify that there was no other Assignments [sic] in existence. There is no discovery dispute. Delmar cannot produce what does not exist.[5]

(Doc. No. 35-18 at 2). Thus, on August 8, 2024, Delmar took the position in writing that there was no existing assignment of the '160 Patent from Shuler to Delmar—a position that is 180 degrees from the position it now trying to argue. The Court finds this letter from Delmar to be an admission that the IPA does not assign Delmar any ownership interest in the patent.

---

[5] The assignment that was produced was not related to the '160 Patent. The statement that no other assignments exist is an outright falsehood given its position on this motion.

12

Secondly, while the legal issue in *Allergen* was similar to the question here, the Court finds that the two agreements are significantly distinguishable, and so the Eastern District court's analysis is not persuasive here. To start, though Delmar only references a single provision of the IPA, the Court must read the "shall be the exclusive property" language in context with the following paragraph contained in the same section:

> At any time, and from time to time, at Company's request, <u>Employee shall (a) immediately execute and deliver any and all such deeds, assignments, consents, documents, and/or further instruments of transfer and conveyance, and take or cause to be taken all such other actions, as Company may reasonably deem necessary to desirable in order to fully and effectively vest in Company and/or to confirm Company's title to and possession of any and all of the inventions,</u> designs, improvements, discoveries, computer programs, patent rights, copyrights and/or all other intellectual property discussed in or contemplated by this Agreement and/or to which Company is entitled by contract, law, equity or otherwise; and (b) do all other things necessary and/or reasonably request by Company to vest Company with full and exclusive title and ownership thereto and protect the same against infringement by others.

(Doc. No. 40-2 at 2) (emphasis added). This paragraph, read in harmony with the paragraph immediately preceding it, undercuts any reasonable argument that the IPA served as an automatic present assignment of future interests.

The IPA creates an explicit obligation for the employee to later, if requested, "execute and deliver any and all such deeds, assignments . . ." to Delmar. This language dispels any notion that all assignments are *already executed and delivered*, as Delmar argues. (Doc. No. 40-2 at 2). There is no summary judgment evidence in the record that demonstrates that any such request was ever made. Affirming the Court's understanding of this provision is the language immediately following it—"Employee shall . . . take . . . all such other actions as Company may deem reasonably necessary . . . to fully and effectively vest in Company . . . title to and possession of any and all [patents]." (*Id.*). Thus, the IPA explicitly requires an employee, when requested, to assign the rights to all patents, or take any other action necessary to vest those rights in Delmar. There is no evidence of any such request in this case. Moreover, if the first paragraph acted as an automatic transfer, this

13

paragraph would be rendered surplusage. Consequently, the IPA cannot reasonably be interpreted to have already vested ownership rights of future patents in Delmar.

Shuler's testimony establishes that he did not execute an assignment agreement relating to the '160 Patent. Shuler testified that he never understood that his inventions were automatically assigned to Delmar, and that he only remembers assigning Delmar an interest in a different patent application filed in 2019. (Doc. No. 35-3 at 13). Further, when Shuler did assign Delmar the interest in that patent application, he did it through an entirely separate assignment agreement. (Doc. No. 35-17). Shuler's testimony directly undercuts the affidavit of Delmar CEO John Shelton, as the Court describes below. *See infra* at 15, n.4. Shuler's testimony accords with this Court's reading of the IPA's assignment provisions.

Instead of contending with this language or providing an alternative interpretation, Delmar fails to acknowledge either of these provisions, and it makes no attempt to explain why its interpretation of one sentence, isolated from the rest of the document (and from Delmar's history of operating under the IPA) is reasonable. As such, based on a plain reading of the IPA, the Court finds that no prior or present assignment of patent rights existed. Instead, the Court concludes that the IPA constituted an obligation that any rights would be assigned at a time that Delmar chose— a choice that, based on the summary judgment record, was never exercised. Therefore, the Court finds that the IPA is not ambiguous, and does not give Delmar an ownership interest in the '160 Patent as a matter of law.

Though it has no present ownership interest in the patent, Delmar can still raise a fact issue regarding its standing by showing that it has "concrete financial interests" in the '160 Patent. Bardex argues that Delmar provides no evidence of any specific instance in which it lost money by Shuler's exclusion from the inventor list of the '160 Patent. While Delmar's Response brief

14

conclusively states that it has a concrete financial interest in the '160 Patent, at no point does it list a single example or direct the Court to any evidence supporting such a claim. While neither party has articulated a definition of "concrete financial interest," and indeed the Federal Circuit does not seem to have recognized one, Delmar provides no evidence that could be construed as such an interest. *See, e.g., Chou*, 254 F.3d at 1359 (holding that entitlement to proceeds from licensing were a "concrete financial interest"); *Jim Arnold Corp. v. Hydrotech Systems, Inc.*, 109 F.3d 1567, 1571–72 (Fed. Cir. 1997) (holding a financial interest that was contingent on "judicial intervention to change the situation" was too attenuated to establish a concrete financial interest); *Larson*, 569 F.3d at 1327 (holding that "because being declared the sole inventor will not generate any other direct financial rewards" there was no concrete financial interest); *Eastwood v. Molecular Def. Corp.*, 373 F. Supp. 502, 507 (S.D.N.Y. 2019) (finding that a shareholder of the company that would have an ownership interest did not have a concrete financial interest because its connection was too attenuated). Regardless, Delmar's arguments rely principally on its claim of a present ownership interest in the '160 Patent based on the language of the Intellectual Property Agreement which, as stated above, does not create such an interest. Thus, even if Delmar could feasibly have a concrete financial interest, it makes no effort to put forth evidence of any such interest.

Delmar does attach an affidavit of its CEO John Shelton—though the affidavit is not referenced or cited once in the brief. (Doc. No. 40-1). Nevertheless, this affidavit makes no reference to any specific and concrete financial interest in the '160 Patent, which is probably why Delmar chose not to cite it. Primarily, the affidavit serves to authenticate the IPA and other confidentiality agreements entered by Delmar and Bardex, none of which raise a fact issue on the claim of a concrete financial interest. Even reading the affidavit generously, the only arguably relevant provision concludes that "[i]t was the mutual understanding of Delmar and Dillon Shuler

that Dillon Shuler was hired to invent and that all inventions created by Mr. Shuler during his employment were the property of Delmar." (Doc. No. 40-1 at 2). This conclusory statement alone is insufficient to demonstrate a concrete financial interest in the '160 Patent.

The affidavit simply states that both sides understood that Delmar owned all of Shuler's inventions.[6] Regardless of whether both Delmar and Shuler agreed on that conclusion—and in fact there is evidence that Shuler did *not* believe that was the case—their belief is entirely different from evidence actually supporting the existence of an ownership or concrete financial interest. As the IPA does not give Delmar a present ownership interest in the '160 Patent, a statement that someone believes it does is insufficient to create a genuine issue of material fact. Conclusory statements that Delmar possessed a concrete financial interest in the '160 Patent, absent any supporting evidence or documentation, do not raise a fact issue. *See* FED. R. CIV. PRO. 56(e).

Finally, Delmar asserts in one paragraph that it satisfies Article III standing requirements through its "shop rights" in the '160 Patent. (Doc. No. 40 at 10). Delmar states that an employer has a "shop right" in any invention developed "during the employee's time or with the assistance of the employer's property or labor." (*Id.*). Since Shuler was an employee at the time Atallah and Graney applied for the '160 Patent, Delmar argues that it has an "implied, non-exclusive, royalty-free license" to use the patented technology through the shop rights. (*Id.*). Bardex's Reply contends that even if a "shop right" could be proven, there are no grounds for finding a shop right sufficient to establish an ownership or concrete financial interest. (Doc. No. 47 at 9).

---

[6]   Shelton does not provide any factual basis for his claim regarding Shuler's understanding of Delmar's interest in his patents. Further, as stated above, Shelton's affidavit, prepared two months after Shuler's deposition, directly contradicts Shuler's sworn testimony that he did not understand his inventions to be automatically assigned to Delmar, and Delmar's own representation to the Court that no such assignment existed. Clearly, Shelton's conclusion is mere speculation.

16

"Shop rights" have been described in various ways throughout the patent related case law. While they have been categorized in some cases as implied licenses, other cases describe them as a species of equitable estoppel. *Rentrop v. Spectranetics Corp.*, 514 F. Supp. 2d 511, 529–30 (S.D.N.Y. 2007). Despite the competing theories underlying the rights, the Federal Circuit has noted that the analysis "in each case is driven by principles of equity and fairness . . . ." *McElmurry v. Ark. Power & Light Co.*, 995 F.2d 1576, 1580 (Fed. Cir. 1993). Either way, the Federal Circuit primarily applies the shop rights concept as a means to prevent an employee from suing an employer for infringement of the employee's invention. *See McElmurry*, 955 F.2d at 1582; *U.S. v. Dubilier Condenser Corp.*, 289 U.S. 178, 188–89 (1933) ("Since the servant uses his master's time, facilities and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property . . . ."). It may provide Delmar a defense against claims by Shuler, but it does not give Delmar a claim against Bardex.

Even presuming that Delmar has an equitable license by virtue of any "shop rights" in any patent that Shuler owns, Delmar points to no authority—and indeed the Court can find none—that recognizes the equitable doctrine of shop rights as sufficient to establish standing in this context. Based on the Federal Circuit's case law, a shop right in the '160 Patent simply protects Delmar from an infringement suit brought by Shuler. As a doctrine founded in "equity and fairness" shop rights serve as an equitable shield, not a sword. That being the case, the concept of "shop rights" as put forth here does not create a concrete and particularized harm suffered by Delmar sufficient to satisfy the first prong of Article III's standing requirement.

Thus, the Court does not find that Delmar has sufficiently established its Article III standing to sue under § 256. Without a plaintiff that has established standing, the Court is without jurisdiction to over Delmar's § 256 claim, and it is therefore **DISMISSED** without prejudice.[7]

## IV.   Conclusion

Based on the foregoing, the Court **GRANTS** Defendant Bardex's Motion for Summary Judgment, (Doc. No. 35), solely to the extent that raises the question of whether this Court possesses subject matter jurisdiction over Plaintiff Delmar's 35 U.S.C. § 265 claim. Since the Court lacks jurisdiction to rule on any other pending motions, the case is hereby **DISMISSED** without prejudice.

Signed this 24th day of January, 2025.

Andrew S. Hanen
United States District Judge

---

[7] In addition to lacking standing, Delmar's ownership dispute with Shuler—who does not concede that Delmar owns any rights to the '160 Patent—creates a ripeness problem as well. Any dispute that exists between Shuler and Delmar would likely need to be resolved in Delmar's favor before Delmar could plausibly establish standing to bring the instant suit. The remedy for bringing a claim that is not yet ripe is dismissal without prejudice. *DM Arbor Court, Ltd. v. City of Houston*, 988 F.3d 215, 221 (5th Cir. 2021) ("As is proper when a dispute is not ripe, the district court dismissed the case without prejudice."). Consequently, this Court would need to dismiss this claim on this ground as well.